Corbin A. and Dorice S. MCNEILL,
Petitioners,

v.

UNITED STATES of America,
Respondent.

Case No: 14–CV–172–F

United States District Court,
D. Wyoming.

Signed 02/24/2017

---

Gabriel G. Tsui, Leech Tishman Fuscaldo & Lampl LLC, Oak Brook, IL, Gordon B. Nash, Jr, Jeffrey D. Perconte, Drinker Biddle Reath LLP, Chicago, IL, Paul J. Hickey, Hickey & Evans, Cheyenne, WY, for Petitioners.

C Levi Martin, United States Attorneys Office, Cheyenne, WY, Joseph A. Sergi,

Richard A. Schwartz, Yael Bortnick, US Department of Justice, Washington, DC, for Respondent.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING THE PETITION FOR REFUND OF PENALTIES AND INTEREST

NANCY D. FREUDENTHAL, CHIEF UNITED STATES DISTRICT JUDGE

This matter is before the Court following a bench trial commencing on February 14, 2017 before Nancy D. Freudenthal, United States District Court Judge. Jeffrey D. Perconte, Gabriel Tsui, and Paul Hickey appeared as counsel for Petitioners and Joseph A. Sergi, Yael Bortnick, and Levi Martin appeared as counsel for Respondent.

## INTRODUCTION, STATEMENT OF UNDISPUTED FACTS, AND CONTENTIONS

First, it is important to appreciate what this case is not about. This case is not about the IRS's conclusions that a highly complex series of partnership transactions were done solely for purposes of tax avoidance as a sham, lacking economic substance and not for any legitimaté business purpose and were thus illegal. The Court accepts that we have an abusive tax shelter, more specifically a distressed asset/debt ("DAD") tax shelter in the form of Brazilian accounts receivable. A simplified explanation of the particular DAD used in this case can be found in the Court's Conclusions of Law. In short, the shelter was designed by a promoter, an investment manager, and a law firm (not the McNeills), and it "worked" (to use that term quite loosely) only on paper as no one apparently had any real interest in collect-

ing on the Brazilian accounts receivable. The only way the shelter could "work" at all, even on paper, was because of a loophole in the partnership sections of the tax law that were closed by Congress in 2004.[1] In 2002, the illegal, abusive DAD tax shelter naturally appealed to wealthy people looking for personal tax strategies to manage their wealth and minimize taxes.

Hence, we have Petitioners Corbin A. McNeill and his wife Doriċe S. McNeill (the "McNeills"). The McNeills are a wealthy couple living in Jackson, Wyoming who invested in this Brazilian DAD tax shelter scheme in 2002, as it was promoted or legitimatized to them by others whom they trusted or came to trust. The McNeills have paid the taxes, interest, and penalties assessed to them after the sham partnership was properly disregarded by the IRS and the scheme (and tax advantages) fell apart. Thus, this case involves only a claim for a refund of the accuracy-related penalties assessed in connection with the tax loss Petitioners recognized on their 2002 joint income tax return.

The McNeills contend they reasonably relied in good faith on the professional opinions and actions of competent tax and legal advisors before filing their 2002 tax return, including the law firm De Castro, West, Chodorow, Glickfield & Nass, Inc. ("De Castro"), and the accounting firm Ernst & Young ("E & Y") which prepared and signed the McNeills' return as the tax preparer. Respondent, United States of America ("the government") opposes the McNeills' claim for a refund, contending the McNeills have not met their burden to show they reasonably relied in good faith on tax and legal professionals. The government contends the McNeills participated in an abusive tax shelter, resulting in a phony

---

1. As noted in *Superior Trading, LLC v. C.I.R.*, 728 F.3d 676, 678 (7th Cir. 2013), "[a] DAD shelter is based on a tax loophole closed by

the American Jobs Creation Act of 2004, Pub. L.No. 108–357, § 833, 118 Stat. 1589, amending 26 U.S.C. §§ 704(c), 743...."

$20 million loss on their 2002 income tax return. As a result, the Commissioner of the Internal Revenue Service (the "Commissioner") assessed penalties against them pursuant to 26 U.S.C. § 6662. As such, the government contends the McNeills are liable for those penalties and not entitled to any defense based on their purported good faith reliance on the advice of counsel or tax advisors. First, the government contends the McNeills cannot rely on the advice of E & Y because (1) they cannot show they ever actually received or relied on advice from E & Y, and (2) the E & Y Memorandum does not meet the "more likely than not" standard required to establish reasonable cause. Second, the government contends the McNeills cannot rely on the De Castro law firm opinions because (1) De Castro had an inherent conflict of interest, (2) De Castro was not independent of the transaction, (3) the McNeills did not provide accurate information and representations to De Castro, and (4) the De Castro opinions were based on unreasonable and/or unsupported assumptions.

This case presents a close call. However, in evaluating the totality of the facts and circumstances and in focusing on Mr. McNeill's knowledge as a taxpayer, his effort to assess the proper tax liability, and his reliance on tax advice by qualified professionals who concluded the strategy complied with the tax law—as more fully discussed below—the Court finds and concludes the McNeills proved they had reasonable cause and acted in good faith by deducting the built-in losses associated with the partnership-based DAD transaction, and are thus entitled to avoid the accuracy-related penalty.

The Court finds the following facts are established by admissions in the pleadings, stipulations of counsel prior to the pretrial conference, or undisputed testimony at trial.

Mr. McNeill's Background and Experience:

1. The McNeills are a married couple residing in Jackson, Wyoming.

2. Mr. McNeill is a 1962 graduate of the United States Naval Academy. He retired from the Navy in 1981 after achieving the rank of Commander and commanding a nuclear submarine.

3. After he retired from the Navy, Mr. McNeill worked at a nuclear power plant in New York, where he was the senior vice president.

4. In 1988, Mr. McNeill went to work for Philadelphia Electric, which later became known as PECO Energy, as the executive vice president for nuclear generation.

5. In 1992, Mr. McNeill became the president of PECO Energy. In 1996, he became CEO. In 1998, he became chairman.

6. In 2000, PECO Energy merged with Unicom to become Exelon Corporation.

7. Mr. McNeill was chairman of the Board and co–CEO of Exelon until he retired in 2002.

8. Mr. McNeill served on several not-for-profit boards, including Salem Community Hospital, Leadership, Inc., Drexel University, the Medical College of Pennsylvania, and the Naval Academy Alumni Association. He also served on several foundations, including his family's foundation and the Naval Academy Foundation.

The Supplemental Executive Retirement Program ("SERF") Payment:

9. As a benefit afforded to executives for the utility, Mr. McNeill had access to E & Y for tax, financial and investment services, among other services. E & Y is a nationally recognized "Big

4" accounting firm, and Mr. McNeill took advantage of this benefit.

10. Under the terms of Mr. McNeill's separation agreement with Exelon, he realized approximately $66 million in gross income. Ex. 1.

11. As part of his severance package, Mr. McNeill expected to receive an $18 million SERP payment.

Mr. McNeill's Inquiries Leading to Gramercy:

12. Sometime in 2002, Mr. McNeill spoke with Robert Gary, a former colleague in the utility industry, and asked him for a referral to a firm which might have investment opportunities with positive tax benefits. Mr. Gary referred Mr. McNeill to SageMark Consulting through "Mr. Rhodes". In a phone call with Mr. Rhodes, Mr. Rhodes suggested that Mr. McNeill consider distressed debt opportunities, which had a built in tax loss in one segment.

13. In a subsequent mid-July telephone conversation with Mr. Rhodes and another person identified as a former IRS employee, Mr. McNeill learned more about the details of the distressed debt (or DAD) investment, and was told it met the IRS code requirements. Mr. Rhodes introduced Mr. McNeill to Paul Shanbrom, a partner in the Tax Solutions Group at BDO Seidman LLP ("BDO"). BDO was a nationally-known accounting firm.

14. Mr. McNeill discussed BDO with E & Y and E&Y confirmed that BDO had an excellent reputation.

15. Mr. McNeill talked to Mr. Shanbrom who promoted Gramercy Advisors ("Gramercy") and its area of expertise in distressed debt and emerging markets. Mr. Shanbrom provided an expanded level of detail about the nature of the DAD transaction, including how it involved foreign debt, and Mr. Shanbrom identified Gramercy as an investment manager.

16. Mr. McNeill read an article in *Net Worth* magazine about Gramercy and was impressed with Gramercy's success as described in the article. Ex. 2. The article confirmed to Mr. McNeill that Gramercy was a real company with niche expertise in distressed debt. He sent the article to his adviser at E & Y and asked E & Y to look into Gramercy. E & Y told Mr. McNeill that Gramercy had a good track record.

17. On November 22, 2002, Mr. McNeill met with Mr. Shanbrom and Scott Hendon (another partner in BDO's Tax Solutions Group) at the Wort Hotel in Jackson, Wyoming. A representative from Gramercy was expected to attend the meeting but ultimately was unable to be there. At the meeting, BDO again pitched the Gramercy–managed DAD transaction and Mr.McNeill learned it involved Brazilian debt. Mr. McNeill said he was interested in the transaction but wanted to think about it more over the weekend.

18. On Monday, Mr. McNeill told BDO he wanted to move forward. Mr. McNeill received a consulting agreement from Mr. Shanbrom under which he agreed to pay BDO $1,450,000.00 for consulting services in conjunction with potential investments and investment transactions for the McNeills. Ex. 4. Mr. McNeill signed the agreement, paid the consulting services fee, and a $50,000.00 fee for a written opinion from BDO on the Gramercy DAD transaction.

The Gramercy DAD Transaction:

19. Skiper Acessorios de Moda Ltda ("Skiper"), an entity organized un-

der the laws of Brazil, contributed emerging market receivables with a face value of approximately 24,586,-960 Brazilian Reals (R$) for a 99% interest in Hapenn, LLC ("Hapenn"). Ex. 21.

20. On November 26, 2002, Hapenn contributed the Brazilian accounts receivable from Skiper to Dulwich, LLC ("Dulwich") in exchange for a 99% ownership interest in Dulwich. Ex. 8. The other 1% interest was held by Tall Ships Capital Management, LLC, a Gramercy entity. Ex. 10, p. 8.

21. On December 9, 2002, Mr. McNeill acquired 89.1% of Hapenn's interest in Dulwich for $298,955.09. Ex. 7.

22. Under the terms of the investment management agreement with Gramercy, the McNeills were required to invest a total of $3,000,000.00 in Dulwich. Ex. 5.

23. On December 9, 2002, Mr. McNeill became the managing member of Dulwich.

24. On December 9, 2002, Dulwich contributed the Brazilian accounts receivable it received from Hapenn to Livrpol, LLC ("Livrpol"). Ex. 12.

25. On December 9, 2002, the McNeills contributed $2,701,044.91 in cash to Dulwich, which Dulwich then contributed to Livrpol. Ex. 11, 12.

26. Tall Ships Capital Management, LLC, was the sole manager of Livrpol, and Gramercy Asset Management, LLC was the tax matters partner. Ex. 13.

27. Gramercy's role, through various entities, was purportedly to manage the Brazilian accounts receivable held by Livrpol and the additional

$2,701,044.91 the McNeills invested with Gramercy (which was first held in Dulwich and then transferred to Livrpol). Ex. 5.

28. On December 26, 2002, Livrpol sold a portion of the Brazilian accounts receivable to Gramercy Financial Services for $339,378.93. Ex. 15.

29. Based on the "sale" of the Brazilian accounts receivable for $339,378.93, compared to the basis established by Hapenn's original contribution (24,-586,960 R$),[2] Livrpol reported an ordinary loss on the sale of $22,258,267.00 for 2002, a portion of which ($20,324,440.00) flowed through to the McNeills' personal 2002 income tax return as an ordinary loss, which purported to offset the income Mr. McNeill received from his severance package.

Advice Received by the McNeills Prior to Filing their 2002 Tax Return:

30. BDO provided the McNeills with a written opinion stating that by reporting the losses from the Brazilian accounts receivable (DAD) transaction, they complied with the United States tax code. Ex. 30. However, BDO is not a law firm and the McNeills did not rely on this opinion.

31. In the BDO consulting agreement, BDO recommended the McNeills get a tax opinion on the transaction. Ex. 4. Mr. McNeill asked BDO for a recommendation and BDO recommended two law firms, one of which included De Castro.

32. On December 12, 2002, after briefly looking into both firms, talking to one of De Castro's principals Mr.

---

2. The basis is contested because the Government contends the loss reported on the various tax returns incorrectly relies on the amount of basis in Brazilian Reals, without converting the Reals to dollars consistent with the appropriate exchange rate.

Nass—whose resume and experience with these transactions impressed Mr. McNeill—and concluding they wanted a west-coast firm for geographic convenience, the McNeills engaged the De Castro law firm for the tax opinion. The McNeills also signed a conflict of interest waiver acknowledging De Castro had previously provided legal services to Gramercy concerning investments similar to the Brazilian accounts receivable. Ex. 28.

33. On March 3, 2003, De Castro provided opinion letters to the McNeills and Dulwich blessing the tax aspects of the 2002 transaction. Ex. 17. As part of that opinion, De Castro obtained an opinion from local counsel in Brazil that the Brazilian accounts receivable were valid and enforceable debts. Ex. 19.

34. De Castro knew the McNeills intended to rely on the firm's legal advice regarding the tax implications of the Brazilian accounts receivable transaction.

35. Mr. McNeill also consulted E & Y before investing in Dulwich.

36. E & Y considered the potential tax benefits of the McNeills' investment in Dulwich, including the investment in the Brazilian accounts receivable, prior to the McNeills' investment.

37. Based on its review of the potential Dulwich investment, which included discussing the investment with BDO, E & Y informed Mr. McNeill that recognizing a loss from the potential investment in Dulwich and Brazilian accounts receivable transaction would comply with the United States Tax Code.

38. During December of 2002, E & Y prepared multiple tax estimates for the McNeills that assumed an estimated $20,000,000.00 loss, the McNeills could recognize on their 2002 tax return as a result of their Dulwich investment and Brazilian accounts receivable transaction.

39. E & Y created and provided a checklist to the McNeills regarding the additional approximate $17 million investment in Dulwich and other financial transactions the McNeills had to conduct no later than December 31, 2002. Ex. 37.

40. E & Y recognized and advised the McNeills that the additional $17 million would increase the McNeills' basis in Dulwich, which would in turn allow the McNeills to report the full extent of Dulwich's anticipated loss in 2002 on their personal tax returns.

41. For the 2002 federal income tax year, the McNeills timely filed a joint federal income tax return, prepared and signed by E & Y. Ex. 16.

42. Prior to signing the McNeills' 2002 tax return, Mr. McNeill's E & Y investment advisor was told E & Y needed an internal review and memorandum regarding the tax treatment of the Brazilian accounts receivable transaction (the E & Y Memorandum). Ex. 22. Mr. McNeill's E & Y investment advisor told Mr. McNeill of this internal review and report as it would be billed to him. Ex. R. While the McNeills did not receive the E & Y memorandum before they filed their 2002 return, they knew the internal review was satisfactory because E & Y's signature appeared on the bottom of their 2002 tax return.

Treatment of the DAD Transaction by the IRS:

43. On December 20, 2006, the Commissioner determined the McNeills' DAD transaction was an illegal tax

avoidance technique and issued a Final Partnership Administrative Adjustment ("FPAA") for the tax year ending on December 31, 2002 to Livrpol and Dulwich. Ex. A, B. The Livrpol FPAA was sent to Dulwich, a partner of Livrpol. Ex. A.

44. Gramercy, the TMP of Livrpol, did not contest the proposed adjustments. However, Dulwich did contest the proposed adjustments by filing a Petition for Readjustment of Partnership Items in the District of Connecticut, Case No. 3:07–cv–0796.

45. On July 22, 2009, the United States District Court for the District of Connecticut dismissed the Livrpol case with prejudice. The entry of Dismissal Order stated:

> Pursuant to 26 U.S.C. § 6226(h), this Court deems the Notices of Final Partnership Administrative Adjustment ("FPAAs") issued to Livrpol, LLC and LIVRPOL, LLC, as challenged by the Petitioners in civil action numbers 3:07–cv–00796 (JBA) and 3:08–cv–00086 (JBA), to be correct. However, this Order does not adjudicate any partner-level defenses by Corbin and Dorice McNeill, such as a reasonable cause/good faith defense, under 26 U.S.C. § 6226 and the correspondent Treasury Regulations, to the assessment of penalties for the tax years 2002 and 2003.

46. After deciding the partnership's overall tax liability and penalties, the IRS issued a tax assessment for each individual partner. The IRS determined the McNeills' share of the partnership's tax liability, including interest, was approximately $7.75 million. This amount was paid in full. On or around August 30, 2012, the McNeills made a deposit in the amount of $4,589,312.51, representing the amount of accuracy-related penalties and associated interest for the adjustments made by the Livrpol FPAA. On or around October 5, 2012, the McNeills made a refund claim of this penalty and interest amount, by filing Form 843, Claim for Refund and Request for Abatement. Ex. 25. The claim argued the McNeills had "reasonable cause" for the position they took and they filed the joint tax return in "good faith." *See* 26 U.S.C. § 6664(c)(1). Because the IRS did not respond to the refund claim, on August 22, 2014, the McNeills filed a Petition for Refund of Penalties and Interest with the Court. CM/ECF Document No. (Doc.) 1.

## FINDINGS OF FACT

1. In 2002, Mr. McNeill talked to his advisor at E & Y, which resulted in the identification of certain goals for his investment portfolio to (1) diversify out of Exelon stock, (2) diversify his investments to avoid risk, and (3) identify investments with positive tax benefits.

2. Toward this end, E & Y recommended the Personal Investment Company ("PICO") strategy, involving the creation of a corporation by Mr. McNeill and the principals of Bricolage Capital, LLC ("Bircolage"). Ex. Q. Mr. McNeill understood Bricolage was a currency trading company. Mr. McNeill declined to make the investment as he was unfamiliar with currency trading and not comfortable with transferring losses and profits through this mechanism. Following his decision to abandon this strategy, through the recommendation of a utility peer Mr. Gary, Mr. McNeill began inquiring

into distressed debt opportunities which began with SageMark, ultimately leading him to BDO as an investment advisor, and then to Gramercy as an investment manager. Ex. 4, 5.

3. At the November 22, 2002 meeting at the Wort Hotel between Mr. McNeill and the two BDO representatives, BDO explained the structure of the distressed asset/debt (or DAD) tax shelter and how it could be used to generate a large loss with little economic outlay. During this meeting, BDO suggested Mr. McNeill enter into a DAD transaction. Essentially, if debt is "distressed debt" (i.e. debt with low collection potential), like the Brazilian accounts receivable, it will have a high face value (R$ 24,586,960), but a low fair market value ($298,-955.09—the amount contributed by Mr. McNeill for 90% of Hapenn's interest in Dulwich). Thus, the idea was to use a series of partnerships and sets of transactions to eventually transfer to the McNeills losses that foreign debt holders had already suffered by way of the distressed debt, so the McNeills could claim these losses as deductions against the high severance package income expected in 2002.

4. Thus, the tax advisors established a series of partnerships in which Brazilian debt holders contributed their distressed debt instrument (and their basis in them), into the DAD, and the McNeills contributed relatively small sums of money for the DAD. Mr. McNeill testified he pursued this tax management strategy because it offered the practical result of deferring taxes from the current year to the future year. As designed, the testimony was that this transaction would operate to defer taxes because the sale of the DAD left Mr. McNeill's basis in Dulwich at a very low number (perhaps zero), even though the partnership still held significant assets because of the basis-building contributions made by the McNeills. Therefore, any gain on the remaining assets in future years would be fully taxable, as would any distribution of cash, stocks, or bonds out of the partnership.[3]

5. The sale of the distressed debt by Livrpol allowed the McNeills (as the controlling owner of Livrpol) to generate a loss (a paper loss they never truly suffered in any economic terms) in seventeen (17) days. This was anticipated and timed to hopefully offset the $20 million gain the McNeills received in 2002.

6. Prior to Mr. McNeill entering into the DAD transaction, E & Y looked into the partnership-based DAD transaction strategy at Mr. McNeill's request, obtained information about it from Mr. McNeill and Mr. Shanbrom with BDO, and reviewed a variety of documents including Operating Agreements for Dulwich and Livrpol, Contribution Agreements, and other documents required for banking and the transactions undertaken by E & Y to implement the strategy. In addition, E & Y prepared tax projections for the McNeills, which anticipated a $20,000,000.00 loss. E & Y managed the basis-build required for the anticipated 2002 loss. Moreover, Mr.

---

**3.** The government questioned whether deferral of taxes was ever in anyone's mind as there are no documents which show the payment of taxes deferred to future years. However, the Court believes Mr. McNeill and his explanation that tax deferral, rather than avoidance, was an objective.

McNeill testified he expected E & Y to ask questions as necessary to form their opinion about whether the strategy worked under the tax laws.

7. In support of the legal opinion written by De Castro, De Castro had a variety of documents related to the partnerships as noted in their tax opinion. *See* Ex. 17, p. CM0814–CM0815. Mr. McNeill testified he expected De Castro to ask questions as necessary for the tax opinion. Mr. McNeill also testified De Castro had an ethical obligation to tell him if it could not issue an opinion because it had either been a promoter of the Gramercy DAD transaction or if it came to believe it had a conflict of interest. Neither was communicated to Mr. McNeill.

8. Mr. McNeill signed a representation letter prepared by De Castro. Ex. 29. He testified this did not seem unusual to him as he would not have otherwise known what representations De Castro required for the legal opinion. In the representation letter, Mr. McNeill represented to De Castro, among other representations (Ex. 29):

> Based upon the advice of the Managing Member (or its affiliate), and upon [Mr. McNeill's] own independent evaluation, [Mr. McNeill] had an opportunity to make an aggregate gross return from the LLCs in excess of the sum of [Mr. McNeill's] net investment in the LLCs and any investment management fee paid by [Mr. McNeill], without regard to tax benefits.

> [Mr. McNeill] contributed assets to [Dulwich] for substantial business reasons....

> [Mr. McNeill's] decision to enter into the Investment Transactions was made based solely on the economics of the Investment Transactions, i.e. on a stand alone basis, and

without taking into account the effects of or upon any of Investor's other investments or transactions.

9. Notwithstanding the efforts made by BDO, Gramercy, De Castro, and E & Y to "paper the deal," the scheme did not withstand IRS scrutiny. The IRS disregarded the partnerships, thus Mr. McNeill's true basis in the foreign debt became the modest amount he contributed to the partnerships. As a result, the IRS concluded the tax avoidance scheme merited several million dollars in penalties and interest.

10. Before the McNeills signed their 2002 joint tax return, no one told Mr. McNeill that taking the $20 million loss on his 2002 tax return would be illegal or against the tax code. Mr. McNeill testified that no one mentioned the sham transaction doctrine (or, assumedly, the step transaction doctrine, the economic substance doctrine, or any other anti-abuse doctrines or provisions) until he read about the phrase in the draft tax opinion from De Castro. Ex. 31. There is also no evidence in the record to suggest anyone at E & Y advised Mr. McNeill the partnerships could be disregarded under any of the anti-abuse doctrines or provisions discussed in the De Castro opinion. Further, the De Castro opinion concludes the transaction (and partnerships) would survive the application of these doctrines. The Court finds Mr. McNeill's testimony on this issue is credible.

11. It is clear from the testimony that no advisor reasonably and fairly alerted Mr. McNeill about the importance of a profit motive, business purpose, and economic substance underlying

the partnerships and DAD transaction. Mr. McNeill's focus was on other objectives he valued, including legal protection, diversification, and tax deferral opportunities. Additionally, every discussion Mr. McNeill had reinforced the view that the scheme complied with the code as it applied to partnerships in 2002.

12. However, notwithstanding Mr. McNeill's focus at the time, he is a fairly sophisticated businessman. Throughout his time in business, he gained experienced with distressed debt. Mr. McNeill testified that he understood most companies selling uncollectible debt write it down to the revenue received from the sale. Mr. McNeill testified he understood Skiper did not write down the Brazilian DAD and said he was told or saw a document saying the debt did not need to be written down.

13. While perhaps sophisticated as a businessman in the direct sale of the debt, Mr. McNeill does not appear to have been sophisticated in terms of a contribution (not sale) of debt to a partnership by a foreign entity, and the acquisition of partnership interests (as opposed to the direct acquisition of debt). While unquestionably smart and accomplished in his own right, in the context of the complex DAD shelter before the Court which was specifically designed and implemented by others to exploit the tax code's partnership provisions,

Mr. McNeill is not knowledgeable or sophisticated. As examples, Mr. McNeill testified he did not remember how he determined profitability regarding investment in distressed debt and he could not remember the business purpose for which Dulwich was formed without looking at the documents. Even as a sophisticated businessman, he never made any inquiries with Gramercy about their expertise in Brazilian account receivables or consumer debt, but assumed if Gramercy had invested in Brazilian DAD as a trading platform,[4] it would be profitable. Notably, this assumption was reinforced by E & Y, the article in *Net Worth*, as well as De Castro's conclusions that Mr. McNeill could have reasonably expected a substantial return on his investment independent of tax considerations, which De Castro notes is supported by the economic expertise, analysis, and track record of Gramercy in the area of "emerging market" debt instruments. Ex. 17, p. CM0812. For these reasons, the Court finds Mr. McNeill is not experienced, knowledgeable, sophisticated, or educated about a partnership-based DAD transaction and tax strategy like that at issue in this case.

14. From the perspective of someone not knowledgeable or sophisticated about acquiring a partnership interest in

---

4. By his testimony, Mr. McNeill appeared to understand how bad debt might be profitable in the context of a legitimate business. One essentially determines what a collection of distressed debt is worth (say fifteen (15) cents on the dollar), and in acquiring that collection debt, the profitability depends on a "bet" that it might ultimately be worth more (say twenty-four (24) cents on the dollar). In this case, on December 9, McNeill purchased the partnership interest of Hapenn (essentially the distressed debt) for $298,955.09. Ex. 7. Ultimately, when the distressed debt was sold seventeen (17) days later, the debt sold for $339,378.93. Ex. 15.

distressed debt designed and implemented by investment managers and tax lawyers, an important inquiry by the Court concerns the effort undertaken by the McNeills to assess their proper tax liability, and whether those efforts were reasonable. The evidence related to this inquiry is that Mr. McNeill sought and obtained a positive, independent opinion from a qualified advisor, E & Y, about BDO—the entity promoting the strategy. Mr. McNeill sought and obtained a positive independent opinion from E & Y about Gramercy, the investment manager, in terms of its track record in dealing with distressed debt as a trading platform. Mr. McNeill sought tax advice, and actually received two separate unequivocally positive indicators from qualified lawyers and tax advisors at E & Y that the Gramercy strategy "worked," in that the anticipated tax loss from the strategy was compliant and lawful under the partnership tax code sections. The McNeills had reason to place confidence in this evaluation because E & Y brought in lawyers specializing in this area of the code (the "code-heads") who had direct communications with Mr. McNeill, BDO, and Gramercy. Mr. McNeill further testified he gained more confidence in E & Y's advice because tax professionals at E & Y were monitoring legislation that would change the tax treatment of the proposed strategy, and it was reported to him that the legislation did not pass.[5] As E & Y owed him a fiduciary duty as investment and tax advisors, the McNeills had reason to believe E & Y would ask Mr.

McNeill and others relevant questions as needed to form the views the tax advisors communicated to Mr. McNeill. Finally, at the recommendation of BDO and following his own research, Mr. McNeill sought and obtained a tax opinion from a qualified tax law firm, De Castro. While he could have asked E & Y for a recommendation of a tax law firm, or selected some other firm not recommended by BDO, it was not unreasonable for Mr. McNeill to see an advantage in engaging a law firm who had experience both with Gramercy as well as foreign distressed debt. And while Mr. McNeill was asked to sign a "Conflict of Interest Waiver," he was advised there was no conflict of interest by a principal of the law firm, and he reasonably expected to be advised during the engagement if a conflict arose. The fact Mr. McNeill was nott advised of any conflict relates more to the ethics of the law firm than to the reasonableness of Mr. McNeill's actions and reliance.

15. The fact Mr. McNeill signed a representation letter drafted by De Castro, which contained representations or assumptions that were not true, does not necessarily destroy Mr. McNeill's reasonable cause and good faith defense. In considering the evidence in the record, the Court cannot find Mr. McNeill knew or should have known the representations were false. Mr. McNeill represented to De Castro he contributed assets to Dulwich for substantial business reasons. From Mr. McNeill's perspective—with his knowledge as an

---

5. As noted earlier, the "tax loophole" underlying a DAD shelter was closed by the American Jobs Creation Act of 2004, Pub.L. No. 108–357, § 833, 118 Stat. 1589, amending 26 U.S.C. §§ 704(c), 743. *See Superior Trading, LLC v. C.I.R.,* 728 F.3d 676, 678 (7th Cir. 2013).

investor in a purported partnership (not with the knowledge of the investment manager, a tax advisor, or the IRS),[6]—this representation is consistent with the record that the $20 million invested in Dulwich was to diversify out of Exelon stock, diversify beyond that to avoid risk by way of a hedge fund or emerging market fund containing a mix of assets that would not be correlated and would be managed by an investment manager with a good track record for a high return on the fund, and to minimize taxes. At the individual partner level, these are legitimate business reasons for investing, even if they are not legitimate business reasons at the partnership level or for the investment to be managed through a partnership. The fact that these business purposes were not sufficient to imbue the partnership with legitimacy for tax purposes does not call into question Mr. McNeill's knowledge regarding the relevant facts. Again, the focus is at the taxpayer/partner level and on what he knew or should have known.

16. A taxpayer such as McNeill is not required to correctly anticipate the legal consequences the IRS or the courts will attach to the facts underlying a transaction. *See Southgate Master Fund, LLC ex rel. Montgomery Capital Advisors, LLC v. United States,* 659 F.3d 466, 494 (5th Cir. 2011). Nor is a taxpayer required to second-guess qualified, apparently independent and objective professionals who, in retrospect, might have turned out to be untrustworthy. After all, there's the old adage, "Who would

buy a watchdog to protect his person and property, and then seek to do his own barking?" *Goldsmith v. Pyramid Commc'n, Inc.,* 362 F.Supp. 694, 696 (S.D.N.Y. 1973). McNeill turned to qualified professionals he trusted, told them what his purposes were and what he knew, provided the documents he had, reasonably expected questions if more information was needed, and referred the qualified professionals to others who knew more. Thus, the Court finds Mr. McNeill neither knew nor should have known his representations to De Castro of a "substantial business reason" for his contributions in Dulwich were false.

17. The government points out that Mr. McNeill also made other representations to De Castro that were false, including that he had the opportunity to make a return on his investment without regard to tax benefits, and that his decision to enter into the investment transactions was made solely on the economics of those transactions without taking into account his other investments or transactions. These representations present the most difficulty for the McNeills. It is clear these representations were not true and it is a close call as to whether Mr. McNeill knew or should have known they were false. However, the Court finds the representations to be consistent with Mr. McNeill's reliance on Gramercy's track record of investing in distressed debt, along with his reasonable understanding that taxpayers may lawfully arrange their affairs to

---

6. *See, e.g., Southgate Master Fund, LLC ex rel. Montgomery Capital Advisors, LLC v. United States,* 659 F.3d 466, 494 (5th Cir. 2011)

("[o]ur focus is on the taxpayer's knowledge, not the tax advisor's").

keep taxes as low as possible. The fact the tax strategy turned out to be an illegal DAD shelter and could not be used to minimize taxes does not change the analysis as Mr. McNeill was told time and again that the scheme was legal. Mr. McNeill should not be penalized by way of inferring knowledge concerning sham transactions he did not know and reasonably should not have known, particularly when lawyer "code heads" and others apparently failed to discern or disclose the illegal and abusive nature of the transactions.

18. The government also contends a reasonable, prudent taxpayer with Mr. McNeill's knowledge and financial and business sophistication would have realized in a heartbeat the DAD shelter, with the potential to generate a built-in $20 million "paper" tax loss on a $300,000.00 investment with professional fees calculated on percentages of the anticipated loss, was simply too good to be true. The government characterizes Mr. McNeill as someone in a "rushed quest for a tax solution to shelter income," and thus failing to undertake a reasonable effort to assess his proper tax liability for purposes of avoiding penalties in the following respects: (1) he did not receive a detailed sheet on BDO following E & Y's "due diligence"; (2) he had no contact with Gramercy; (3) he did not examine the details of the transaction or Gramercy's ability to produce a profit, let alone one that would overcome the $1.5 million he paid in fees; (4) he did not notice the currency exchange rate error;[7] (5) there was no focus on debt collection; (6) there was no document showing any tax deferral; (7) he did not ask E. & Y for an independent recommendation for a law firm; (8) he did not consider the business purpose; (9) he did not notice Gramercy essentially sold the debt to itself; (10) he did not notice the relation of fees to anticipated loss; (11) he did not notice the "sale" by Gramercy was not a sale of debt for cash, but a sale of one type of foreign debt for another; and (12) he signed a representation letter prepared by De Castro without verifying the facts.

19. As discussed above, the Court disagrees with the government's characterization of Mr. McNeill as "sophisticated" in terms of this complex DAD tax shelter. And while in retrospect one can hypothesize and criticize what was not done by any taxpayer, the factual questions in this case concern what Mr. McNeill did, what he knew or should have known, and whether he relied on unreasonable assumptions or on advice that was not objectively reasonable in terms of quality and objectivity. With these considerations in mind, Mr. McNeill did more to independently investigate the Gramercy DAD transaction than he did with the Bricolage transaction in terms of asking E & Y (an independent, well-respected company) to conduct "due diligence" on BDO and Gramercy, and obtaining a tax opinion from a

7. This refers to an alleged disposition rate error in the conversion of Brazilian Reals to dollars. See Ex. 29. While acknowledging the documents may all contain a currency error, Mr. McNeill testified he did not inquire into the conversion rate, and believed E & Y could properly rely on K–1s produced by certified professionals. Other than what is in the documents (which is not consistent), there is no testimony from which the Court could find or calculate the correct conversion rate as of any particular date.

qualified legal tax professional. He testified he did not notice any connection between fees and costs, he did not tend to negotiate any fees, and he considered these particular fees to be reasonable in the context of the larger $20 million investment and the intellectual "work product" that had gone into designing and implementing the tax strategy. According to the government, while anyone could have and should have noticed the deal was "too good to be true," it was not commented on by tax law experts either at E & Y or De Castro, both of whom owed Mr. McNeill a fiduciary duty to provide him with objective, professional advice, free from conflict of interest, and knew the partnership tax provisions well enough to paper the deal to their satisfaction. Again, the Court is unwilling to impute knowledge or require additional effort by the taxpayer when such knowledge and effort was either not possessed, shared, or exercised by qualified tax professionals at BDO, E & Y, and De Castro who knew Mr. McNeill was relying on (and paying for) that precise expertise.

20. Therefore, based on the totality of these circumstances, the Court finds the efforts undertaken by the McNeills to assess their proper tax liability were subjectively and objectively reasonable. The Court further finds their reliance on E & Y and De Castro was in good faith and based on all pertinent facts and circumstances and the law as it relates to those facts and circumstances. Finally, the Court finds the McNeills did not know or have reason to know that De Castro was burdened by a conflict of interest.

CONCLUSIONS OF LAW

1. The Court has jurisdiction under 28 U.S.C. § 1346(a)(1).

2. Any finding of fact that contains a conclusion of law is incorporated herein.

3. The penalty at issue here is referred to as the accuracy-related penalty. Internal Revenue Code § 6664(c)(1) provides, the accuracy-related penalty shall not be imposed if the taxpayer establishes there was reasonable cause for the position that resulted in the penalty and the taxpayer acted in good faith in taking that position. *Stobie Creek v. United States*, 608 F.3d 1366, 1381 (Fed. Cir. 2010) (quoting Treas. Reg. § 1.6664–4(b)(1)).

4. A taxpayer has the burden of proving the Commissioner's accuracy related penalty determinations under Section 6662 are incorrect. *See Neonatology Assoc., P.A. v. Comm'r*, 299 F.3d 221, 233 (3d Cir. 2002); *Hayden v. Comm'r*, 204 F.3d 772, 775 (7th Cir. 2000); *Palm Canyon X Invs. v. Comm'r*, 2009 WL 4824326, at *14 (T.C.M. 2009); *Stobie Creek*, 82 Fed. Cl. 636, 704 (Fed. Cl. 2008). Moreover, a taxpayer bears the burden of proof on its reasonable cause and good faith defense. *Klamath Strategic Inv. Fund, LLC v. United States*, 568 F.3d 537, 548 (5th Cir. 2009); *see also Stobie Creek*, 608 F.3d at 1381; *Conway v. United States*, 326 F.3d 1268, 1278 (Fed. Cir. 2003); *Murfam Farms, LLC ex rel. Murphy v. United States*, 94 Fed.Cl. 235, 245–46 (Fed. Cl. 2010).

5. Reasonable reliance on the advice of competent and independent counsel who analyzed all the pertinent facts and authorities, and who unambiguously states there is a greater than fifty (50) percent likelihood that the tax treatment of the

item will be upheld if challenged by the IRS, is a defense to the imposition of an accuracy-related penalty. Treas. Reg. § 1.6664–4(b)(1); *United States v. Boyle*, 469 U.S. 241, 246, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985). However, "[r]eliance on a tax advisor 'does not necessarily demonstrate reasonable cause and good faith.'" *Maguire Partners–Master Invs., LLC v. United States*, 2009 WL 4907033, at \*21 (C.D. Cal. Dec. 11, 2009) (quoting Treas. Reg. § 1.6662–4(b)).

6. The regulations set forth several requirements that must be shown to establish such reliance. First, the taxpayer must show the advice was based on "all pertinent facts and circumstances and the law as it relates to those facts and circumstances." Treas. Reg. § 1.6664–4(c)(1)(i). Second, the advice relied on must not be based on any "unreasonable factual or legal assumptions," and must not "unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person." Treas. Reg. § 1.6664–4(c)(1)(ii). Third, the taxpayer's reliance on the advice must itself be objectively reasonable. "The reasonableness of any reliance turns on the quality and objectivity of the advice." *Stobie Creek*, 608 F.3d at 1381 (citing *Klamath Strategic Invs. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537, 548 (5th Cir. 2009); *Chamberlain v. Comm'r*, 66 F.3d 729 (5th Cir. 1995); *Swayze v. United States*, 785 F.2d 715, 719 (9th Cir. 1986)). For example, reliance is not reasonable "if the taxpayer knew or should have known that the transaction was 'too good to be true,' based on all the circumstances, including the taxpayer's

education, sophistication, business experience, and purposes for entering into the transaction." *Stobie Creek*, 608 F.3d at 1382 (citing Treas. Reg. § 1.6664–4(c); *Hansen v. C.I.R.*, 471 F.3d 1021, 1032 (9th Cir. 2006)).

7. In analyzing the McNeills' reasonable cause defense, one must understand the DAD transaction from the perspective of the different rules which apply to the sales of partnership interests. In 2002, these rules contained a loophole which operated to the effect that purchasing an interest in a partnership which owns property can offer big tax advantages compared to purchasing the property directly. The following discussion from *Southgate Master Fund, LLC ex rel. Montgomery Capital Advisors, LLC*, 659 F.3d 466, 471–472 (5th Cir. 2011) is helpful in understanding these tax advantages:

> When a partner acquires an interest in a partnership by contributing property to the partnership, the contribution is generally not a taxable disposition of the property. Instead, the partner's basis in the property transfers, or carries over, to the partnership. The partnership's basis in the transferred property is often referred to as "inside basis," and the partnership has the same inside basis in the property that the partner had before the contribution. If, at the time of the transfer, the property's fair market value is lower than the partner's adjusted basis in the property, the property has a built-in loss.
>
> · · ·
>
> [Then, assume that] the contributing partner sells his partnership interest to a new partner before the

partnership sells the property with the built-in loss. In that circumstance, Treasury Regulation 1.704–3(a)(7) requires the built-in loss to be allocated to the partner who purchased the partnership interest in the same manner that it would have been allocated to the contributing partner. This rule enables the benefit of claiming the loss as a tax deduction to be separated and transferred away from the person who suffered the real, economic loss of the property's diminution of value.

8. This simplified overview describes the transaction structure that BDO proposed to Mr. McNeill for his acquisition of the Brazilian DAD, and why one might see the proposal as a code-compliant, tax-friendly investment vehicle. Hapenn (through Skiper's initial contribution) was holding DAD with a huge built-in loss (i.e., a cost basis that far exceeded the debts' fair market value). If Mr. McNeill purchased the Brazilian DAD directly from Skiper or Hapenn, the built-in loss would evaporate and Mr. McNeill would take a cost basis in the Brazilian DAD equal to the purchase price. If Hapenn instead contributed the Brazilian DAD to a partnership (Dulwich) and Mr. McNeill then purchased Hapenn's interest in the partnership, the built-in loss would be preserved and transferred to Mr. McNeill because Mr. McNeill would step into Hapenn's shoes. Then, pursuant to Treasury Regulation section 1.704–3(a)(7), any loss realized on the partnership's sale of the Brazilian DAD would be allocated to Mr. McNeill for tax purposes, arguably of ordinary-income character.

9. However, this discussion does not end the tax plan requirements for this deal to generate a loss deductible by a taxpayer in 2002. In order to take the paper loss generated by any sale of the Brazilian DAD, Mr. McNeill needed to build his "outside basis" in Dulwich. Again, turning to *Southgate* for a simplified explanation,

> A partner's 'outside basis' is his adjusted basis in his ownership interest in the partnership. When a partner purchases a partnership interest, he generally takes a cost basis in his partnership interest. In other words, his outside basis is equal to the amount he paid to acquire the partnership interest. And while partnership losses are deductible by the individual partners, the amount of allocated partnership loss that a partner can claim as a deduction on his individual tax return is capped at the amount of his outside basis. If the amount of a partnership loss that is allocable to the partner exceeds his outside basis, the overage remains suspended inside the partnership and can only be claimed if the partner builds his outside basis during a future tax year.

*Southgate*, 659 F.3d at 476–477. Thus, in order to recognize the anticipated $20 million loss from the sale of the Brazilian DAD, Mr. McNeill had to have a $20 million basis in Dulwich.

10. The fact that the built-in loss was *allocable* to Mr. McNeill under the code was not enough to make the full value of those losses *deductible* by Mr. McNeill on his 2002 tax return. Up until close to the end of December of 2002, Mr. McNeill's outside basis in Dulwich was only $3 million. Ex. 23, p. EY1616. To be able to deduct most of the anticipated built-in loss that was allocable to

him, Mr. McNeill needed to build his outside basis in Dulwich.

11. That was the purpose of what the parties have referred to as the Dulwich basis-build. In short, by December 31, 2002, Mr. McNeill needed to transfer a total of $20 million to allocate the $20 million loss he expected from the anticipated sale of the Brazilian DAD. He did this by a series of transfers of cash and stocks and bonds. Ex. 23, p. EY1616.

12. So, if the deal was structured to formally comply with the black-letter provisions of the tax code and its implementing regulations, what happened to deprive Mr. McNeill of his hoped-for tax benefits? As with *Southgate*, the answer relies on various judicial doctrines, including the economic-substance doctrine, the sham-partnership doctrine, and the doctrine of substance over form. *See Southgate*, 659 F.3d at 479. These and other anti-abuse doctrines were successfully and appropriately used by the IRS to support its conclusion that Dulwich and Livrpol were formed and availed of solely for purposes of tax avoidance as a sham, lacking economic substance, and not for any legitimate purpose of carrying on a business by partners or for the sharing of profits and losses from such legitimate business purposes. Ex. B, p. 8. Thus, both partnerships were **not recognized** for federal income tax purposes and all transactions engaged in by them were treated as engaged in by the purported partners of Dulwich. *Id.* In short, the IRS used these doctrines to refuse to consider the Brazilian DAD was contributed to Dulwich by Hapenn, or that Dulwich then contributed the DAD to Livrpol. Instead, the IRS deemed the DAD was purchased directly by Mr.

McNeill outside of any partnership structure. Therefore, these judicial doctrines blew apart the partnerships and the tax scheme, and deprived Dulwich (and thus Mr. McNeill) of its high partner-held "inside basis" and the built-in loss when the Brazilian DAD was sold, notwithstanding compliance with the black letter tax code and its implementing regulations.

13. The McNeills bear the burden of proof on their reasonable cause and good faith defense. Before considering this question, the government advances the argument that Mr. McNeill's contentions concerning reliance on E & Y's advice should not be considered by the Court because E & Y's advice was not referenced in the refund request to the IRS. *See* Ex. P, p. 25. The Court might be more receptive to the government's argument had there been an inadequate factual background in the refund claim and had the IRS considered the McNeills' refund claim as presented. Rather, the IRS took no action on the refund claim and Mr. McNeill filed this petition with the Court. The purpose for the requirement to set forth each ground upon which a refund is claimed with sufficiently detailed facts is to prevent surprise and give adequate notice of the claim and its underlying facts, so the IRS can make an administrative investigation and determination regarding the claim. *Burlington Northern Inc. v. United States*, 684 F.2d 866, 868 (U.S.C.C. 1982). In this case, the Court concludes the administrative refund claim fairly and adequately asked the IRS to investigate the question of reasonable, good faith reliance by the taxpayer sufficient

to avoid penalties. The IRS made no apparent investigation or determination. Consequently, the McNeills are not precluded from raising facts concerning E & Y's investigations and advice in this proceeding.

14. Further, the government argues the McNeills cannot rely on E & Y's advice because E & Y's engagement letter with Mr. McNeill specifically states E & Y is not providing tax or legal advice, and all advice must be in writing. On this argument, the Court also agrees with the McNeills that the particular engagement letter in the record is limited on its face to investment advisory services, which is a very small percentage of the work done for Mr. McNeill by E & Y, and does not preclude the reasonableness of his reliance on oral advice indisputably given in this case concerning BDO, Gramercy, and the application of the tax law to the Gramercy DAD transaction.

15. On the critical burden of proof question, consistent with the Court's Findings of Fact, evaluating the totality of the facts and circumstances and focusing on Mr. McNeill's knowledge as taxpayer, his effort to assess the proper tax liability, and his reliance on tax advice by qualified professionals who concluded the tax strategy complied with the tax law, the Court concludes the McNeills have carried their burden of proof to avoid the accuracy-related penalties assessed by the IRS.

## ORDER

IT IS THEREFORE HEREBY ORDERED the Petition for Refund of Penalties and Interest is APPROVED.

IT IS FURTHER ORDERED the determinations by the Internal Revenue Service with respect to penalties for the 2002 tax year are VACATED.

IT IS FINALLY ORDERED the penalties and associated interest paid by Petitioners for the adjustments made by the Livrpol FPAA shall be REFUNDED.