T.C. Memo. 2017-206

UNITED STATES TAX COURT

CORBIN A. MCNEILL AND DORICE S. MCNEILL, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14340-10L.                    Filed October 18, 2017.

Gordon B. Nash, Jr., Gabriel G. Tsui, and Michael T. Mazzone, for
petitioners.

H. Barton Thomas, Jr., Robert M. Romashko, and Gorica B. Lakic, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, Judge:  Petitioners seek review of respondent's notice of
determination to sustain a notice of Federal tax lien filing and a proposed levy for
2003.  The underlying assessment originated from petitioners' investment in a tax

[*2] shelter. Petitioners' assessed deficiency associated with the tax shelter has been paid in full with interest. The section 6662 accuracy-related penalty related to that deficiency remains unpaid.[1] Petitioners' primary dispute is whether they are liable for the section 6662 penalty for 2003, taking into account certain partner-level defenses. Petitioners also dispute whether the settlement officer (SO) abused her discretion in failing to verify that all requirements of applicable law and administrative procedure had been met.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, the second supplemental stipulation of facts, and the accompanying exhibits are incorporated herein by this reference. The record in this case was closed on June 22, 2015. Petitioners resided in Wyoming when they filed their petition.

Collection Due Process Background

On April 20, 2009, respondent issued to petitioners a Final Notice, Notice of Intent to Levy and Notice of Your Right to a Hearing for 2003 (levy notice). On

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. All references to currency are expressed in U.S. dollars.

**[*3]** April 23, 2009, respondent issued to petitioners a Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC Section 6320 for 2003 (NFTL filing). On April 23, 2009, petitioners timely submitted a request for a collection due process (CDP) hearing regarding the levy notice and updated their CDP hearing request on May 13, 2009, to include the NFTL filing.

At the time of the CDP hearing request, Mr. McNeill had pending in the U.S. District Court for the District of Connecticut a case regarding a partnership adjustment that generated the penalty amounts subject to the levy notice and the NFTL filing. The District Court entered an order of dismissal; the court explicitly declined to adjudicate any partner-level defenses, such as a reasonable cause defense under section 6664. The SO reviewed the District Court's order of dismissal and determined that notwithstanding the order's specific wording, petitioners could not raise the issue of the section 6662 penalty or their partner-level defense at the CDP hearing because they had had a prior opportunity to contest the liability.[2] The SO issued to petitioners a Notice of Determination

---

[2]Before trial respondent acknowledged that despite the SO's determination, petitioners have not had a prior opportunity to contest the penalty or present their partner-level defenses under sec. 6330(c)(2)(B). The Court's jurisdiction to review the underlying tax in a CDP proceeding was expanded under the Pension Protection Act of 2006, Pub. L. No. 109-280, sec. 855, 120 Stat. at 1019. Thus, the Court has jurisdiction to consider the applicability of a sec. 6662 penalty

(continued...)

**[\*4]** Concerning Collection Action(s) Under Section 6320 and 6330 (notice of determination), and petitioners timely filed a petition in this Court.

Petitioners' Background

Mr. and Mrs. McNeill met in grade school. They have been married for over 50 years and have five children.

Mr. McNeill graduated from the U.S. Naval Academy in 1962 and served as a Naval officer until 1981. Mr. McNeill was the commander of a nuclear submarine at the time of his retirement. Following his honorable service in the Navy, Mr. McNeill worked in the nuclear power industry. In 1988 Mr. McNeill joined the Philadelphia Electric Co. (PECO) as the executive vice president of nuclear generation. In 1992 he was promoted to president and became PECO's chief executive officer (CEO) in 1996.

In 2000 PECO merged with Unicom Corp. and was renamed Exelon Corp. (Exelon). Mr. McNeill became Exelon's chairman and co-CEO; this role included direct oversight of the chief financial officer, whose duties included accounting, tax, and tax strategies. In 2002 Mr. McNeill retired from Exelon but continued to serve as a director on various boards. Exelon provided Mr. McNeill a substantial

---

[2](...continued)
assessed against petitioners. See McNeill v. Commissioner (McNeill I), 148 T.C. __ (June 19, 2017).

[*5] benefits package, including both a severance payment and vested stock options, valued at over $66 million.

Mr. McNeill's Retirement Planning

Ernst & Young (EY) provided petitioners with financial advice and tax return preparation services. EY projected that petitioners would realize $66,486,264.26 of gross income if all of Mr. McNeill's stock options vested and were exercised at $50 per share in 2002. Mr. McNeill investigated several strategies to minimize his tax liability; he chose a strategy marketed by BDO Seidman, LLP (BDO). Mr. McNeill was intrigued with investing in emerging markets and investing through distressed debt. BDO marketed a tax saving strategy using foreign distressed debt in conjunction with Gramercy Advisors (Gramercy), a firm specializing in emerging market debt investing. The strategy was called a distressed asset/debt (DAD) transaction, and Mr. McNeill purchased two transactions.

The DAD Transactions

Although the first transaction is not before the Court, it is helpful in contextualizing Mr. McNeill's relationships and understanding with respect to the second. Mr. McNeill purchased consulting services from BDO in both 2002 and 2003. The DAD transactions involved an investment in foreign consumer debt

**[*6]** with high cost basis and low fair market value through a series of limited

liability company (LLC) transactions.[3]

On November 25, 2002, Mr. McNeill signed the agreement for consulting

services related to the first DAD transaction. BDO coordinated with Gramercy to

complete the transaction. BDO agreed to provide Mr. McNeill with a tax opinion

regarding the tax consequences of the transaction. The agreement also advised

Mr. McNeill to retain a law firm for legal advice and additional legal opinions.

Mr. McNeill was obligated to pay BDO $1,450,000 in exchange for the 2002

DAD-transaction-related consulting services.

---

[3]Gramercy arranged DAD transactions so foreign consumer debt was assigned to a U.S. LLC in exchange for a membership interest in a "contributing" LLC, a Gramercy-managed entity. The contributing LLC would subsequently contribute the consumer debt to a level 2 LLC in exchange for a membership interest in the level 2 LLC; a Gramercy entity would also acquire and maintain a 1% interest in the level 2 LLC. This LLC was designed to sell to investors. The investing client would then contribute cash to acquire approximately 90% of the contributing LLC's membership interest in the level 2 LLC. After the client purchased the membership interest, the foreign company would redeem its membership interest in the contributing LLC for cash. The client would become the sole manager of the level 2 LLC and contribute securities or additional cash to increase his or her basis in the entity. The level 2 LLC would then contribute the consumer debt to a level 3 LLC in exchange for a membership interest in the level 3 LLC. The level 2 LLC would own 99% of the level 3 LLC, and a Gramercy entity would be the manager and own 1% of the level 3 LLC. Following this contribution the consumer debt would be exchanged for assets at a significant loss with another Gramercy LLC to achieve the desired tax effect of recognizing the inherent loss in the consumer debt.

[*7]   In 2002, pursuant to the general plan, a Gramercy entity contributed Brazilian consumer debt to an LLC that offered Mr. McNeill the opportunity to invest in another entity that owned Brazilian consumer debt with a high cost basis and low fair market value.  In December 2002 Mr. McNeill purchased for approximately $3 million a Gramercy/BDO DAD transaction that resulted in a loss that petitioners deducted on their 2002 income tax return.  On December 31, 2002, pursuant to his contractual obligation, Mr. McNeill contributed additional assets worth $16,943,863 to the LLC to increase his basis in the entity.  Mr. McNeill's 2002 allocated portion of the loss totaled over $20 million.

In 2003 Mr. McNeill participated in a substantially similar structured transaction with BDO and Gramercy using a different contribution of Brazilian consumer debt.  In April 2003 Mr. McNeill signed an agreement to pay BDO $725,000 in exchange for consulting services related to the 2003 DAD transaction. BDO agreed to provide Mr. McNeill with a tax opinion regarding the tax consequences of the transaction.  The agreement also advised Mr. McNeill to retain a law firm for legal advice and additional legal opinions.

As in the 2002 DAD transaction, in the 2003 DAD transaction a new Gramercy LLC entity, ANGLAISE, acquired Brazilian consumer debt with high cost basis and low fair market value and contributed it to another Gramercy LLC

[*8] entity, GUISAN.[4]  On May 20, 2003, Mr. McNeill purchased 89.1% of GUISAN from ANGLAISE for $149,997.95.  Mr. McNeill was the sole manager and tax matters member of GUISAN.  Also on May 20, 2003, GUISAN contributed the Brazilian consumer debt to another Gramercy LLC entity, LABAITE, and a Gramercy affiliate was named the sole manager of LABAITE.  On July 1, 2003, Mr. McNeill contributed $2,850,000 to GUISAN and, on December 15, 2003, Mr. McNeill contributed additional assets worth $8,321,394 to GUISAN pursuant to his contractual obligation.  On December 26, 2003, the sole manager of LABAITE directed it to sell a portion of the Brazilian consumer debt to a different Gramercy affiliate.  This sale resulted in a loss.  Mr. McNeill's 2003 allocated portion of this loss totaled $10,300,522.[5]

Reporting the DAD Transaction Losses

According to each consulting agreement, BDO would provide an opinion on the tax consequences of the DAD transactions but suggested that Mr. McNeill retain outside counsel for additional legal review.  Mr. McNeill was surprised by

---

[4]During the year at issue, GUISAN's principal place of business was in Connecticut.

[5]Gramercy has remained the manager of the assets Mr. McNeill contributed to GUISAN.  Since the 2003 loss transaction, GUISAN has earned a profit from the remaining investments.

**[*9]** this suggestion and called the BDO partner to inquire about seeking legal advice before signing the first agreement in 2002.

The BDO partner provided Mr. McNeill with the names of two law firms that would write legal opinions on the tax consequences of the DAD transactions. One of the firms was based in California; the other was based in New York.[6] The partner told Mr. McNeill that De Castro, West, Chodorow, Glickfield & Nass, Inc. (De Castro), had provided other clients with favorable tax opinions for DAD transactions.[7] (BDO had previously negotiated De Castro's legal fee for the law firm's opinions on the basis of the expected potential loss; i.e., De Castro would charge a client 0.5% of the DAD-related loss that was generated for its legal opinion.)

Following that recommendation, on December 11, 2002, Mr. McNeill told the BDO partner that he would like to retain De Castro. Mr. McNeill liked that the firm was headquartered in California--closer to his Wyoming home--and he was impressed with the backgrounds of some of De Castro's attorneys.

---

[6]All 37 of BDO's clients who engaged in DAD transactions selected one of these two firms for a legal opinion.

[7]De Castro had always provided favorable opinions to BDO's clients. These opinions specifically reported that the DAD transactions' tax losses would more likely than not be upheld in court if challenged by the Commissioner.

**[\*10]** The BDO partner contacted De Castro to arrange for and set the price of a tax opinion for Mr. McNeill's 2002 DAD transaction. According to the agreed-upon fee rate, BDO told De Castro to charge $100,000 for the tax opinion--0.5% of Mr. McNeill's expected $20 million tax loss for the 2002 DAD transaction. BDO then called Mr. McNeill to confirm his selection of De Castro. Shortly thereafter, on December 19, 2002, De Castro sent Mr. McNeill a draft of their legal opinion for the 2002 DAD transaction. Subject to the sale of the Brazilian consumer debt, some of the unknown transaction amounts were left blank. Mr. McNeill paid De Castro the prearranged $100,000 fee.

After the consumer debt was sold, De Castro delivered two final opinions for Mr. McNeill's 2002 DAD transaction; both were dated March 3, 2003. The first was addressed to Mr. McNeill personally; the second was addressed to the LLC entity and Mr. McNeill as the sole manager and tax matters member. (Mr. McNeill was also the majority owner.) The opinions concluded that the transaction's tax consequences would more likely than not be respected as reported. In other words, De Castro represented in its opinions that it was more likely than not that a court would agree that Mr. McNeill could recognize a $20,032,440 loss in 2002. Mr. McNeill used De Castro's opinions to support petitioners' signing their joint 2002 Form 1040, U.S. Individual Income Tax

[*11] Return, claiming a deduction for the loss reported on the partnership Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., issued to Mr. McNeill and reflecting the sale of the Brazilian consumer debt to the Gramercy entity.

Pursuant to the consulting agreement dated November 25, 2002, BDO also provided Mr. McNeill a legal opinion on the 2002 DAD transaction. That opinion was dated April 15, 2003, and, like the De Castro opinion, opined that the transaction would more likely than not be upheld if the Commissioner challenged it in court. Later, however, Mr. McNeill did not consider BDO's opinion to be independent because of BDO's involvement with the transaction.

EY prepared petitioners' joint 2002 Form 1040. On April 14, 2003, EY prepared an internal memorandum discussing whether the 2002 DAD transaction satisfied the "realistic possibility of success" standard necessary for it to sign petitioners' return as the return preparer. The memorandum concluded that the transaction would satisfy this standard and that it was acceptable for petitioners to deduct the loss from the 2002 DAD transaction on their 2002 Form 1040.[8] Petitioners claimed a deduction on that Form 1040 for a $20,032,440 ordinary loss.

---

[8]This internal memorandum was not shown to petitioners.

**[*12]** With respect to his 2003 DAD transaction, Mr. McNeill obtained from BDO and De Castro opinions similar to those he had received for the 2002 DAD transaction. Pursuant to the April 2003 consulting agreement, BDO provided Mr. McNeill with a tax opinion--regarding the 2003 DAD transaction, dated April 22, 2004. Like the BDO opinion for the 2002 DAD transaction, BDO's opinion for the 2003 DAD transaction concluded that that transaction would more likely than not be respected as represented if challenged in court. On November 3, 2003, a partner at BDO told Mr. McNeill that De Castro would be calling to discuss the logistics for the 2003 DAD transaction opinion. On December 9, 2003, Mr. McNeill signed with De Castro an agreement letter obligating Mr. McNeill to pay De Castro $50,000 for the opinion for the 2003 DAD transaction. The fee was 0.5% of the expected $10 million loss from the transaction.

De Castro again prepared two opinions, addressing the first to Mr. McNeill personally and the second to GUISAN and Mr. McNeill as the sole manager and tax matters member. (Mr. McNeill was also the majority owner.) Both opinions, dated January 15, 2004, opined that it was more likely than not the 2003 DAD transaction would be upheld if challenged by the Commissioner. Mr. McNeill relied upon these opinions when he filed petitioners' joint 2003 Form 1040.

[*13] EY prepared petitioners' 2003 personal Federal income tax return. Again, EY looked to whether it believed the transaction generating the loss reflected on the Schedules K-1 would meet the "realistic possibility of success" standard. By that time, however, the Treasury regulations for reportable transactions had become final and were effective as of February 28, 2003, prior to both the April 2003 BDO consulting agreement and the May 2003 DAD transaction.[9] T.D. 9046, 2003-1 C.B. 614. EY concluded that Mr. McNeill should file a Form 8886, Reportable Transaction Disclosure Statement, and that EY should not be listed as a material adviser because it had not provided any tax advice with respect to the 2003 DAD transaction. A "Loss transaction" was indicated as the reportable transaction on petitioners' Form 8886.

On their 2003 Form 1040 petitioners deducted a $10,300,552 ordinary loss that flowed through GUISAN, and they included a Form 8886 with their return. Before filing that return, Mr. McNeill called EY to discuss additional required information on the Form 8886. That form requested information on persons who

---

[9]In October 2002 the Secretary first introduced regulations in regard to sec. 165 loss transactions as a reportable transaction. Sec. 1.6011-4T, Temporary Income Tax Regs., 67 Fed. Reg. 64799, 64802 (Oct. 22, 2002). The October 2002 temporary regulations were essentially adopted in their entirety (subject to minor changes) with the promulgation of the 2003 final regulations and their February 28, 2003, effective date. Sec. 1.6011-4(a) through (g), Income Tax Regs.

[*14] had promoted, solicited, or recommended petitioners' participation in the transaction or provided tax advice related to the transaction, and Mr. McNeill was unsure of whom he should list. Mr. McNeill expressed his desire to be conservative, erring on the side of overdisclosure. After an internal inquiry, EY concluded that it should not be included on the Form 8886. On the basis of EY's advice, petitioners listed only BDO and De Castro.

BDO prepared GUISAN's 2003 Form 1065, U.S. Return of Partnership Income, and the subsequent Schedules K-1. GUISAN's 2003 Form 1065 also included a Form 8886, which BDO had prepared. In addition to listing BDO and De Castro, GUISAN's Form 8886 listed Gramercy. Mr. McNeill noticed the discrepancy between the two Forms 8886 and discussed the discrepancy with EY. Although Mr. McNeill and EY concluded that Gramercy should be added to petitioners' personal Form 8886, it appears that this change was not made to the submitted form.

Petitioners' 2003 Form 1040 claimed a $3,605,237 overpayment of income tax and requested that the total overpayment of income tax be refunded. On June 14, 2004, a $3,628,458 refund was issued to petitioners.

**[\*15]** <u>Administrative and Judicial Background</u>

On August 6, 2007, respondent prepared a Form 4549-A, Income Tax Discrepancy Adjustments, for petitioners' 2003 tax year. There is no evidence that the Form 4549-A was either mailed to or received by petitioners before they petitioned this Court. The Form 4549-A listed petitioners' portion of GUISAN's 2003 loss as $10,435,692 and reflected a $3,812,673 deficiency and a $1,525,069 penalty under section 6662(h) for 2003 regarding GUISAN's sale of foreign consumer debt.[10]

On August 24, 2007, respondent issued to LABAITE's partners a Notice of Final Partnership Administrative Adjustment (FPAA) for 2003. The FPAA noted that an examination report would be sent to the tax matters partner and that other partners should contact either respondent or the tax matters partner to request a copy of the examination report. The FPAA reflected an $11,464,048 adjustment in regard to LABAITE's sale of foreign consumer debt and imposed a penalty under section 6662(a) in regard to the claimed loss from the DAD transaction.

---

[10]Respondent noted that the "adjustment to other income that flows from GUISAN is subject to the 40% Substantial Valuation Misstatement penalty per IRC 6662(e)(1)(A) and 6662(h)(1)". The Form 4549-A did not include information regarding any other penalty.

**[*16]** The FPAA listed in the alternative several iterations of the section 6662(a) penalty, including a 40% penalty under subsections (b)(3), (e), and (h).[11]

On January 18, 2008, Mr. McNeill, in his capacity as the tax matters partner of GUISAN, a partner of LABAITE,[12] filed a complaint in the U.S. District Court for the District of Connecticut for judicial review of the 2003 FPAA.[13]  At the same time, petitioners made an estimated deposit of $4,883,355.22, satisfying the jurisdictional requirements of section 6226(e) for 2003.  This payment was sufficient to cover petitioners' deficiency and interest for the GUISAN flowthrough loss; it was not sufficient to cover the section 6662 penalty.[14]

---

[11]In contrast, the only penalty reflected on petitioners' Form 4549-A was the 40% penalty under sec. 6662(h).

[12]GUISAN was a partner other than the tax matters partner of LABAITE.

[13]Judicial review of the 2002 DAD transaction was already pending in the U.S. District Court for the District of Connecticut.

[14]Having previously paid the deficiency arising out of the 2002 DAD transaction FPAA, on or around August 30, 2012, the McNeills deposited with the U.S. Treasury $4,589,312.51, representing penalties and interest stemming from the FPAA's adjustments.  McNeill v. United States, No. 14-CV-00172-F, 2015 WL 5025287, at *6 (D. Wyo. July 23, 2015).  On October 5, 2012, the McNeills filed a Form 843, Claim for Refund and Request for Abatement, but as of August 22, 2014, the Internal Revenue Service (IRS) had not responded.  As a result, the McNeills filed their "Petition for Refund of Penalties and Interest" in the U.S. District Court for the District of Wyoming on that same date.  Id.  The McNeills asserted a partner-level reasonable cause and good-faith defense.  The

(continued...)

[*17] On March 10, 2008, respondent issued to GUISAN a Form 4605-A,

---

¹⁴(...continued)
Government filed its motion for summary judgment, contending the McNeills had no reasonable cause or good faith in taking their 2002 tax positions with respect to the foreign consumer debt loss. The McNeills opposed that motion. Id. On July 23, 2015, the District Court found there was no genuine issue of material fact that remained and granted summary judgment in favor of the Government. Id. at *12. The District Court concluded that

> TEFRA provides for a two-tier process in which partner-level
> defenses may be adjudicated only after partnership-level proceedings.
> But with respect to the managing member, relevant factual
> determinations are made to determine the partnership's treatment
> based on his or her state of mind and conduct. Other member
> partners may raise such defenses. But McNeill is not another partner
> --he was * * * [the LLC entity's] managing member.

Id.

On August 14, 2015, the McNeills appealed the District Court's decision to the U.S. Court of Appeals for the Tenth Circuit. McNeill v. United States, No. 15-8095 (10th Cir. appeal filed Aug. 14, 2015). The Court of Appeals reversed the judgment of the District Court and remanded the case for further proceedings. McNeill v. United States, 836 F.3d 1282 (10th Cir. 2016). The Court of Appeals noted that sec. 6230(c)(4) allows a partner to assert any partner-level defenses that may apply or to challenge the amount of the computational adjustment. Id. at 1285. The Court of Appeals held that the question of "whether, when no party argues that a final judicial ruling exists that triggers judicial preclusion principles, an adverse decision in TEFRA administrative partnership level proceeding prevents a managing (or tax matters) partner from pursuing a reasonable cause/good faith defense in later partner level proceedings" was not appropriate for summary judgment. Id. at 1287. The case was remanded with additional instructions, and in February 2017 the District Court held that petitioners had reasonable cause and good faith in relying on the tax opinions when they filed their 2002 tax return. The Government appealed the District Court's decision in April 2017, but upon the Government's motion, that appeal was dismissed in May 2017.

[*18] Examination Changes--Partnerships, Fiduciaries, Small Business Corporations, and Interest Charge Domestic International Sales Corporations. The accompanying letter explained that the form was necessary for the District Court action to proceed and that respondent was in the process of passing the adjustments through to GUISAN's partners. The Form 4605-A reflected the same $11,464,048 adjustment shown on LABAITE's 2003 FPAA. The remarks regarding the penalty, however, were different; Form 4605-A noted that the adjustment was subject to "the 40% Substantial Valuation Misstatement penalty per IRC 6662(e)(1)(A) and 6662(h)(1), or the 20% Accuracy Related Penalty under section 6662(a)".

On March 31, 2008, respondent assessed tax of $3,812,673 and a section 6662 penalty of $1,525,069 against petitioners, flowing from the 2003 FPAA. Respondent also sent petitioners a Form 3552, Notice of Tax Due on Federal Tax Return, because petitioners' January 18, 2008, deposit was insufficient to pay the section 6662 penalty. Respondent sent petitioners a notice and demand for payment for the unpaid 2003 balance on June 9, 2008, and a notice of intent to levy with respect to the unpaid balance for 2003 on July 14, 2008.

On February 2, 2009, the U.S. District Court for the District of Connecticut consolidated judicial review of the 2002 and 2003 DAD transactions.

[*19] While petitioners' request for a CDP hearing was pending, Mr. McNeill, in his capacity as tax matters partner of GUISAN, filed a motion in the District Court to voluntarily dismiss with prejudice the consolidated cases regarding the 2002 and 2003 DAD transactions. The District Court deemed the FPAAs issued to the 2002 entity and the 2003 entity "as challenged * * * to be correct." Further, the District Court indicated that the order granting the motion to dismiss did not adjudicate any partner-level defenses for petitioners, such as a reasonable cause defense under section 6664 for 2002 and 2003, and granted the motion to dismiss by order dated July 22, 2009.

CDP Hearing for Petitioners' 2003 Tax Liability

Petitioners told the SO that they wished to raise the issue of the penalty from the Tax Equity and Fiscal Responsibility Act assessments that were made as a result of the FPAA. Petitioners said that although they paid the tax and interest, the issue of the penalty remained. The SO acknowledged that petitioners had paid the deficiency and interest for 2003 in January 2008, before the assessment.[15] The SO also acknowledged that the balance of the account reflecting the penalty was assessed before the dismissal of the District Court case on July 22, 2009. The SO

---

[15]Respondent has now conceded that certain assessments of tax and penalty were incorrectly computed, resulting in overassessments of tax and penalty; the amounts should be reduced by $35,346 and $14,138, respectively.

[*20] stated that petitioners had had a prior opportunity to challenge the underlying liability and that the penalty could not be raised in the CDP hearing. She sent the following findings to petitioners on February 24, 2010:

> Based on the procedures cited in this letter, you may not raise the issue of the accuracy-related penalty in your CDP Hearing.
>
> According to Internal Revenue Manual 8.19.8.3.1 (04-14-2008):
>
> A taxpayer's liability resulting from an assessment from a TEFRA entity is final and conclusive. Thus, a taxpayer will not be able to raise challenges to the underlying liability to the extent that it involves deficiencies in tax relating to disallowance or adjustment of losses, deductions, or credits regardless of how the deficiencies were assessed, by settlement agreement, by defaulted FPAA * * * or by a federal court decision. This applies to doubt as to liability offers, non-hardship Effective Tax Administration (ETA) offers (under either public policy or equity grounds), a CDP case, or a claim for refund/abatement. However, it does not apply to doubt as to collectibility offers or hardship offers.
>
> Furthermore, you challenged the assessments in the District Court [of Conn.] proceeding. According to IRM 8.19.8.4 (3) (04-14-2008):
>
> Every investor of a TEFRA partnership (or TEFRA S corporation) for which a petition was filed in the Tax Court, the United States Court of Federal Claims, or the United States District Court [of Conn.] in response to an FPAA * * * is precluded from challenging his liability at a CDP hearing because the investor has had the opportunity to dispute the liability.
>
> The CDP hearing was scheduled for April 6, 2010, and the SO requested

from petitioners: a completed Form 433-A, Collection Information Statement for

**[\*21]** Wage Earners and Self-Employed Individuals, proof of household income, copies of bank statements for the preceding three months, and a copy of the then-current 2009 Form 1040, or a copy of Form 4868, Application for Automatic Extension of Time To File U.S. Individual Income Tax Return.

Petitioners did not send the SO any of the requested information, instead requesting copies of their account transcripts for the 2002 and 2003 tax years. They also requested that the CDP hearing be rescheduled. On April 13, 2010, the SO faxed the account transcripts to petitioners. The parties rescheduled the CDP hearing for April 28, 2010. That hearing was later canceled. Petitioners did not provide a collection alternative or any of the requested supporting documentation to the SO. Accordingly on May 20, 2010, the SO issued a notice for 2003, determining that the collection action should proceed and that the assessment of the penalty was valid.

Petitioners timely filed a petition with the Tax Court to challenge respondent's determinations.

**[\*22]**                                    OPINION

Petitioners raise two challenges.[16]  Petitioners assert, as an affirmative

defense to the section 6662 penalty, that they relied in good faith on professional

advice regarding the DAD transaction that they reported on their 2003 Form 1040.

Petitioners also argue that the SO abused her discretion in failing to verify that all

requirements of applicable law and administrative procedure had been met.

I.      Underlying Liability

Section 6330(d)(1) does not prescribe the standard of review that this Court

should apply in reviewing an IRS administrative determination in a CDP case.

The general parameters for such review are set by the Court's precedent.  Where

the validity of the underlying tax is properly at issue, the Court reviews the

---

[16]The petition challenged respondent's actions broadly as violating secs.
6229 and 6230.  Petitioners reiterated these arguments in a motion for summary
judgment filed on November 29, 2010, and also contended that respondent had
failed to meet several procedural requirements.  The Court denied petitioners'
motion, and petitioners did not further address the sec. 6229 and other procedural
arguments by testimony or on brief.  Those arguments are deemed conceded.  See
Mendes v. Commissioner, 121 T.C. 308, 312-313 (2003) (holding that arguments
not addressed in posttrial brief may be considered abandoned); Leahy v.
Commissioner, 87 T.C. 56, 73-74 (1986) (finding concession by failure to argue).
      With respect to sec. 6230(a), this Court held in McNeill I, 148 T.C. at __
(slip op. at 14), that it has jurisdiction to review petitioners' defense to the asserted
penalty.  Their reasonable cause and good-faith defense is addressed below.
Respondent has conceded that an erroneous computation resulted in an
overassessment.  See infra note 26.  Petitioners point to no other applicable
provisions of sec. 6230.

[*23] Commissioner's determination de novo. Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). Where the underlying tax liability is not at issue, the Court reviews the IRS decision for abuse of discretion. Id. at 182.

Section 6330(c)(2)(B) permits a taxpayer to challenge in a CDP hearing the existence or amount of his underlying tax liability only where he did not receive a notice of deficiency or otherwise have a prior opportunity to contest that liability. Respondent has conceded that petitioners did not have a prior opportunity to raise their partner-level defense to the section 6662 penalty. And petitioners properly raised this issue at the CDP hearing. See sec. 301.6320-1(f)(2), Q&A-F3, Proced. & Admin. Regs.; see also Giamelli v. Commissioner, 129 T.C. 107, 115 (2007). This Court held in McNeill I, 148 T.C. at __ (slip op. at 14), that it has jurisdiction to review respondent's determination as it relates to the asserted section 6662(a) penalty. The Court will accordingly review de novo the IRS determination on this point.

A.    Section 6662 Penalty for DAD Transactions

The Commissioner bears the burden of production with respect to any penalty. Sec. 7491(c). To meet this burden, the Commissioner must produce evidence regarding the appropriateness of imposing the penalty. Higbee v. Commissioner, 116 T.C. 438, 446 (2001); Raeber v. Commissioner, T.C. Memo.

**[*24]** 2011-39. Once the Commissioner carries this burden, the taxpayer bears the burden of proving the penalty is inappropriate because of reasonable cause or otherwise. Higbee v. Commissioner, 116 T.C. at 447.

Section 6662(b)(2) and (3) provides that a taxpayer may be liable for a 20% accuracy-related penalty on the portion of an underpayment of income tax attributable to a substantial understatement of income tax or a substantial valuation misstatement. Section 6662(h) increases a penalty for a valuation misstatement from the 20% penalty of section 6662(e) to 40% if a misstatement is "gross" and not just "substantial". Under section 6662(h), if the value of any property, or the adjusted basis of any property, is 400% or more of the correct amount, there shall be a penalty added to the tax an amount equal to 40% of the misstated value or adjusted basis. See United States v. Woods, 571 U.S. __, 134 S. Ct. 557, 565 (2013) (holding that the gross valuation misstatement penalty applies when a transaction lacking economic substance results in a valuation misstatement); Humboldt Shelby Holding Corp. v. Commissioner, T.C. Memo. 2014-47, at *23, aff'd per summary order, 606 F. App'x 20 (2d Cir. 2015). The section 6662(h) penalty for petitioners' 2003 DAD transaction meets the computational requirements.

[*25] LABAITE claimed that the Brazilian consumer debt had a basis of $11,628,439. Respondent determined that the consumer debt had a basis of zero-- so the 40% penalty applied--and that any loss deduction claimed by LABAITE's partners should be disallowed.[17] In the FPAA respondent also determined that a section 6662 penalty was appropriate at LABAITE's partnership level. See secs. 6221, 6223(a).

In his capacity as GUISAN's tax matters partner, Mr. McNeill contested the partnership-level tax liability and penalty in the FPAA. He later filed a motion to voluntarily have the consolidated cases dismissed with prejudice, which the U.S.

---

[17]Multiple courts have determined that DAD transactions generally lack economic substance and that valuation misstatement penalties are appropriate for taxpayers who engage in the tax shelter because the partnership's basis in the distressed asset or debt was incorrectly reported. See, e.g., Superior Trading, LLC v. Commissioner, 728 F.3d 676, 681 (7th Cir. 2013), aff'g 137 T.C. 70 (2011); Buyuk, LLC v. Commissioner, T.C. Memo. 2013-253; Rovakat, LLC v. Commissioner, T.C. Memo. 2011-225, aff'd, 529 F. App'x 124 (3d Cir. 2013).

On April 18, 2007, before the 2003 FPAA, the Commissioner released a coordinated issue paper that discussed issues relating to DAD transactions. See IRS Coordinated Issue Paper, "Distressed Asset/Debt Tax Shelters", LMSB-04-0407-031 (Apr. 18, 2007). The coordinated issue paper explains that under the step transaction, economic substance, and substance over form doctrines a taxpayer in a typical DAD transaction should not be allowed to deduct the loss related to the sale of the distressed debt. Id. Further, the coordinated issue paper notes that the IRS should assert sec. 6662 penalties for most taxpayers who use DAD transactions because the drastic disparity between the claimed basis and the correct basis of the underlying distressed asset creates a gross valuation misstatement.

[*26] District Court for the District of Connecticut granted on July 22, 2009.

Previously, on March 31, 2008, respondent had assessed a penalty of $1,525,069

against petitioners under section 6662(h).

When petitioners' District Court case was dismissed, the "gross" valuation

misstatement under section 6662(h) was determined to be correct.[18] LABAITE's

claimed basis of $11,682,439 is in excess of 400% of the deemed correct basis of

zero. Petitioners' share of the basis and disallowed loss flowed through to their

personal Federal tax return. Accordingly, their misstatement of their basis is also

"gross" under section 6662(h).[19] Respondent has met his burden of production;

petitioners bear the burden of proving the penalty is inappropriate--because of

reasonable cause or otherwise. See Higbee v. Commissioner, 116 T.C. at 446.

B.     Reasonable Cause and Good Faith

Petitioners argue that notwithstanding the substantive correctness of the

section 6662(h) penalty, it is inapplicable because they had reasonable cause and

acted in good faith. See sec. 6664(c)(1). For the reasons discussed below, the

---

[18]Under sec. 6226(h), partnership-level adjustments are considered correct if the partnership-level action is dismissed. See Miller v. Commissioner, 104 T.C. 378, 382 (1995). Accordingly, the partnership-level penalty is considered correct under sec. 6226(h), and the resulting adjustment is also considered correct.

[19]There is no need to discuss other iterations of the sec. 6662 penalty because they cannot be stacked. See sec. 1.6662-2(c), Income Tax Regs.

**[\*27]** Court disagrees; petitioners do not satisfy the requirements of the affirmative defense and thus cannot use it against the section 6662 penalty.

A taxpayer may avoid the section 6662(h) penalty by showing that he had reasonable cause for a portion of the underpayment and that he acted in good faith with respect to that portion. Sec. 6664(c)(1). Reasonable cause requires that the taxpayer exercise ordinary business care and prudence as to the disputed item. United States v. Boyle, 469 U.S. 241, 246 (1985). That determination is made on a case-by-case basis, taking into account all pertinent facts and circumstances, including the taxpayer's knowledge and experience. Woodsum v. Commissioner, 136 T.C. 585, 591 (2011); sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of the taxpayer's effort to assess his proper tax liability. Sec. 1.6664-4(b)(1), Income Tax Regs.

A taxpayer may demonstrate reasonable cause through good-faith reliance on the advice of an independent professional, such as a tax adviser, a lawyer, or an accountant, as to an item's tax treatment. Boyle, 469 U.S. at 251; Canal Corp. & Subs. v. Commissioner, 135 T.C. 199, 218 (2010). A taxpayer's reliance on the advice of a professional, such as an attorney, may constitute reasonable cause and good faith where the taxpayer proves by a preponderance of the evidence that the taxpayer: (1) reasonably believed that the professional upon whom the reliance

[*28] was placed is a competent tax adviser with sufficient expertise to justify reliance; (2) provided necessary and accurate information to the adviser; and (3) actually relied in good faith on the adviser's judgment.  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98-99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); Rovakat, LLC v. Commissioner, T.C. Memo. 2011-225, slip op. at 65, aff'd, 529 F. App'x 124 (3d Cir. 2013); see also sec. 1.6664-4(c)(1), Income Tax Regs.

Petitioners contend that they should be relieved of the penalty because Mr. McNeill reasonably relied in good faith on the advice of two independent professionals, EY and De Castro, for tax treatment of the 2003 DAD transaction.[20] Their argument is unpersuasive.

### 1.     Good-Faith Reliance on EY

Petitioners claim that they relied on EY to appropriately analyze and report the tax implications of the 2003 DAD transaction.  They contend that the section 6662(h) penalty is inappropriate because they "relied on the fact that * * * [EY] prepared and signed the return".  Petitioners are incorrect.

---

[20]Petitioners originally contended that they relied on BDO for tax advice on the DAD transaction, but at trial they abandoned the assertion that they reasonably and in good faith relied on the BDO opinions in preparation of their partnership returns.  BDO prepared GUISAN's partnership return and subsequent schedules K-1 for 2003, and those documents were supplied to EY for preparation of petitioners' 2003 income tax return.

**[\*29]** A taxpayer cannot avoid a section 6662 penalty solely because an accountant prepared and signed the taxpayer's return. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 100. An independent professional does not necessarily opine on any or all of the items reported therein when preparing a return. See id. Instead, a taxpayer must actually receive advice from an independent professional, such as a tax adviser, a lawyer, or an accountant. See Boyle, 469 U.S. at 251; see also Woodsum v. Commissioner, 136 T.C. at 592-595.

EY prepared and signed petitioners' 2003 tax return but did not give petitioners advice on the loss attributable to the 2003 DAD transaction. For both 2002 and 2003 EY prepared internal memorandums that briefly analyzed Mr. McNeill's DAD transactions. In the memorandums EY looked at the transactions for a "realistic possibility of success". This standard, derived from section 6694(a)(1), relates to imposing penalties on tax return preparers for understating a taxpayer's liability. EY's memoranda reflected the standard of review to ensure it would not be penalized for the positions taken on petitioners' returns--not that they were providing return position advice to petitioners on the DAD transactions. Petitioners did not receive either memorandum and could not have relied upon either.

[*30] The Form 8886 included with petitioners' 2003 personal tax return also demonstrates that Mr. McNeill did not rely on EY for advice concerning the 2003 DAD transaction. Before submitting Form 8886, Mr. McNeill called EY to inquire as to who should be included on the form as persons who promoted, solicited, recommended participation, or <u>provided tax advice</u> related to the transaction. Mr. McNeill wanted to be conservative and include all possible persons to ensure compliance. But the Form 8886 petitioners submitted lists only BDO and De Castro--not EY. This omission shows that even under Mr. McNeill's conservative view, petitioners did not believe EY had promoted, solicited, recommended participation, or provided tax advice for the 2003 DAD transaction.

Accordingly, petitioners' reasonable cause and good-faith defense fails with respect to EY's tax return preparation.[21]

---

[21]The District Court noted that with respect to the 2002 DAD transaction, petitioners' situation "presents a close call." <u>McNeill v. United States</u>, 237 F. Supp. 3d 1171, 1174 (D. Wyo. 2017). The District Court found that "Mr. McNeill sought [and received] tax advice * * * from qualified lawyers and tax advisors at * * * [EY] that the Gramercy strategy 'worked'". <u>Id.</u> at 1182. With respect to the 2003 DAD transaction, however, this Court is presented with a different situation. There is no record of EY's providing tax advice to petitioners; an internal EY communication shows that it considered whether any EY employees "provided tax advice". That question was answered in the negative. In addition, between the 2002 and 2003 transactions, the regulations making these loss transactions "reportable transactions" became final. <u>See</u> sec. 1.6011-4(a) through (g), Income Tax Regs. There is no record of EY's discussing with or providing any advice to

(continued...)

**[\*31]** 2. Good-Faith Reliance on De Castro

Petitioners next point to their reliance on the 2003 De Castro opinion to support their reasonable cause and good-faith defense. Petitioners are again incorrect; they cannot avoid the penalty by relying on an adviser who is not independent. See Blum v. Commissioner, 737 F.3d 1303, 1317-1318 (10th Cir. 2013), aff'g T.C. Memo. 2012-16.

An independent adviser is unburdened with a conflict of interest and is not a promoter of the transaction. See Calloway v. Commissioner, 135 T.C. 26, 47-48 (2010), aff'd, 691 F.3d 1315 (11th Cir. 2012). A promoter is an adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction. 106 Ltd. v. Commissioner, 136 T.C. 67, 79-80 (2011); see also Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121. Taxpayers cannot reasonably rely on advice from an adviser that they knew or should have known was not independent because of an inherent conflict of interest. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98; see also Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121.

---

[21](...continued)
petitioners regarding the impact of these regulations on the 2003 DAD transaction.

[*32] De Castro had an inherent conflict of interest because it was a promoter with a financial interest in the transaction. A promoter may be an adviser who has a financial stake in the transaction besides his normal billing. See 106 Ltd. v. Commissioner, 136 T.C. at 80. While De Castro appeared to charge a flat fee for the tax opinions, there was a prearranged fee schedule with BDO. Instead of charging a fee based on the type or amount of work to be performed, De Castro charged DAD transaction investors a fee based on the amount of tax saved--0.5% of the expected recognized loss.[22] Thus, De Castro had a financial stake in the transaction other than its normal billing; its fee was directly related to the size of the transaction and independent of actual work performed.

The conflict of interest and lack of independence is also demonstrated by the direct correlation between referrals from BDO and the conclusion of De Castro's opinions. De Castro wrote these opinions with the understanding that BDO would refer more work to the law firm if the opinions were favorable to BDO's clients.[23] This close relationship shows that De Castro had an inherent

---

[22]Mr. McNeill paid De Castro $100,000 for the 2002 opinion concerning a $20 million loss and $50,000 for the 2003 opinion concerning a $10 million loss. Both of these fees are 0.5% of the losses for the respective transactions.

[23]At trial the partner from BDO acknowledged that they would have stopped referring clients to De Castro if the law firm had produced opinions contrary to the

(continued...)

[*33] conflict of interest; De Castro had a financial incentive to give favorable opinions to BDO referrals.

The fact that De Castro was one of only two law firms BDO referred should have also indicated to Mr. McNeill that De Castro might not be independent. As noted above, a taxpayer cannot reasonably rely on advice from an adviser that he or she knew or should have known was not independent. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98. Taxpayers should know that an adviser that is referred by a promoter is not independent. See Rogers v. Commissioner, T.C. Memo. 2005-248. BDO gave Mr. McNeill the option of choosing between two law firms to provide legal opinions for the DAD transactions. And BDO told Mr. McNeill that the firms had always given favorable opinions. Mr. McNeill should have known that De Castro was not independent because BDO referred the firm with preexisting knowledge that the law firm would issue a favorable opinion. Therefore, petitioners could not reasonably rely on De Castro's legal advice. See id.

Further, Mr. McNeill should have known that De Castro was not independent because of the financial relationship between the law firm and BDO.

---

[23](...continued)
tax objectives of the DAD transactions.

**[*34]** The interactions among the promoter, the client, and the law firm show that De Castro's tax opinion was essentially a product a promoter provided to investors. See Rovakat, LLC v. Commissioner, T.C. Memo. 2011-225. For example, BDO facilitated the hiring of De Castro. After Mr. McNeill conveyed his choice of law firms, the BDO partner reached out to De Castro to set the fee. And in 2003 BDO did not offer Mr. McNeill the opportunity to use a law firm other than De Castro. Instead, BDO told Mr. McNeill that the law firm would be in contact "to discuss the process for 2003". Mr. McNeill did not hire another, independent firm; he worked solely with BDO, which coordinated with De Castro to write legal opinions congruent with the goals of the DAD transactions.

Furthermore, there are striking similarities between this case and Rovakat, LLC. In Rovakat, LLC v. Commissioner, slip op. at 26, the taxpayer, at the suggestion of a promoter, also hired De Castro to render a 2003 tax opinion regarding the tax consequences of a foreign currency transaction (Rovakat opinion). The taxpayer relied on his promoter to serve as an intermediary between himself and De Castro. Petitioners relied on BDO to serve as that intermediary between Mr. McNeill and De Castro.

Additional similarities appear when comparing the wording used in the Rovakat opinion with the wording used in the opinion provided to Mr. McNeill.

**[*35]** Both opinions were written by De Castro. And both lacked the foundation needed to form their respective legal conclusions.

In the opinion for Mr. McNeill, De Castro concluded that "there is a greater than 50 percent likelihood that the tax treatment will be upheld if challenged by the IRS." In rendering this opinion, De Castro stated: "We assume, but have not independently verified, the accuracy of the description of the [t]ransactions, the authenticity of the relevant documents provided to us * * * and that all commercial transactions occurred in accordance with regular business practices." De Castro relied on "certain representations made by Investor [Mr. McNeill], Contributor [Santa Clara Metalúrgica Ltda.--an entity organized under the laws of Brazil] * * * and Managing Member [Gramercy]."

In the 2003 Rovakat opinion, De Castro also concluded that "there is a greater than 50% likelihood that the tax treatment of the * * * [francs transaction] would be upheld if challenged by the IRS." Id., slip op. at 26. In rendering that opinion, "De Castro 'assumed * * * the accuracy of the factual matters' * * * including * * * basis in the francs, and did not review 'any transactional documents'". Id.

[*36] The opinion given to Mr. McNeill also contained numerous disclaimers that served as notice to petitioners that the legal opinion was tenuous. The opinion stated, for example:

> Congress has actively pursued legislation to curb abusive tax shelters and the media has publicized many of the tax transactions of now large bankrupt entities and high profile individuals. * * * The legislative and political climate and publicity may influence a court to accept the IRS arguments notwithstanding the merits of our analysis.

Identical wording can be found in the conclusion of the Rovakat opinion. Rovakat, LLC v. Commissioner, slip op. at 67 n.27.

Finally, in determining whether a taxpayer relied in good faith on the advice of a professional, the Court considers: (1) the taxpayer's business sophistication and experience, (2) the reasonableness of the advice solicited, and (3) whether the advice was obtained as part of a tax shelter. See 106 Ltd. v. Commissioner, 136 T.C. at 77-78; Rovakat, LLC v. Commissioner, slip op. at 67; see also sec. 1.6664-4(b)(1), Income Tax Regs.

Each factor weighs against a finding that petitioners relied in good faith on De Castro. As a business executive with corporate leadership experience (executive vice president for four years, president for four years, CEO for four years, and co-CEO for two years), a member of various corporate boards, and a graduate of the U.S. Naval Academy--not to mention the commander of a nuclear

[*37] submarine--Mr. McNeill had business sophistication and experience. The incongruity of reporting a loss in excess of $10 million after only four months of ownership and an initial investment of less than $150,000 would have been suspect. Mr. McNeill's purchase of a majority member interest in an LLC whose primary asset was foreign consumer debt was accomplished on a $149,997.95 initial investment but cost petitioners $725,000 in consulting fees paid to BDO and $50,000 for a legal opinion paid to De Castro.

The Court has stated that where an investment has such obviously suspect tax claims as to put a reasonable taxpayer under a duty of inquiry, a good-faith investigation of the underlying viability, financial structure, and economics of the investment is required. Roberson v. Commissioner, T.C. Memo. 1996-335 (citing LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), aff'd without published opinion, 956 F.2d 274 (9th Cir. 1992), and aff'd without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991), and Horn v. Commissioner, 90 T.C. 908, 942 (1988)), aff'd without published opinion, 142 F.3d 435 (6th Cir. 1998); see also Rovakat, LLC v. Commissioner, slip op. at 68.

If Mr. McNeill's business prowess did not allow him to make such a determination, then certainly the fact that the De Castro and BDO opinions were virtually identical in all material respects should have prompted inquiry from an

[*38] independent adviser.  Close inspection of the two opinions reveals that several sections were nearly verbatim.[24]  Mr. McNeill decided not to rely on the BDO opinion because he did not consider it to be an independent opinion.  Because the substantive portions of the De Castro opinion and BDO's opinion were nearly verbatim, he should have known that if he could not rely on the BDO opinion, he also could not reasonably rely on the De Castro opinion.  The Court concludes that after comparison of the BDO and De Castro opinions, any reliance which Mr. McNeill placed on the De Castro opinion was not reasonable.

The U.S. Supreme Court observed long ago that an expert opinion may be had as to any amount.  Winans v. N.Y. & Erie R.R. Co., 62 U.S. 88, 101 (1858).  Legal and tax opinions are no different.  The mere fact that a taxpayer purchases an "opinion" from a self-professed expert does not necessarily mean that the taxpayer relied on the "expert" in good faith.  An individual who blindly relies on a professional opinion to support a transaction too good to be true on its face, such as the Court has here, does so at his or her own peril.  See Rovakat, LLC v. Commissioner, slip op. at 69; cf. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99.  "Never has this been more true than in today's environment where

---

[24]Most of the differences between the BDO and De Castro opinions pertaining to "Allocation of Loss" and sec. 465 were the result of divergent citation conventions--the cited sources were identical.

[*39] taxpayers seek to reduce their tax liabilities by engineering artificial tax losses in complex and/or foreign transactions which leave little to no paperwork [in a series of structured partnership entities] that the Commissioner may access to examine the transaction." Rovakat, LLC v. Commissioner, slip op. at 69.

The final regulations were effective as of February 28, 2003, and treated the DAD loss structure as a reportable transaction. The entirety of petitioners' 2003 DAD transaction occurred after this date. In April 2003 Mr. McNeill entered into the 2003 consulting agreement with BDO. He purchased 89.1% of GUISAN on May 20, 2003, and he contributed $2,850,000 and $8,321,394 to GUISAN on July 1 and December 15, 2003, respectively. On December 26, 2003, the Brazilian consumer debt was sold, generating the losses for which the DAD transaction was designed.

The Court concludes that petitioners' actions are insufficient to constitute reasonable cause under section 6664(c)(1). It follows that the gross valuation misstatement penalty is applicable to the extent stated herein.[25]

---

[25]Petitioners suggest that the doctrine of collateral estoppel binds this Court to the District Court's findings in McNeill v. United States, 237 F. Supp. 3d 1171. Petitioners are mistaken. The doctrine of collateral estoppel applies to issues of fact that are "actually and necessarily determined". Montana v. United States, 440 U.S. 147, 153 (1979). Although the transactions and parties are the same, the issue of whether petitioners acted with reasonable cause and in good faith with

(continued...)

**[\*40]** II.    <u>Abuse of Discretion</u>

The remainder of this case requires our review of the actions of the IRS Appeals Office.  When the Court conducts a de novo review of the underlying liability, the Court reviews all determinations not involving the underlying liability for abuse of discretion.  <u>Craig v. Commissioner</u>, 119 T.C. 252, 260 (2002); <u>see also</u> <u>Gardner v. Commissioner</u>, 145 T.C. 161, 183 (2015).  An action constitutes an abuse of discretion if it is arbitrary, capricious, or without sound basis in fact or law.  <u>Giamelli v. Commissioner</u>, 129 T.C. 107, 111 (2007); <u>see also</u> <u>Gardner v. Commissioner</u>, 145 T.C. at 183.  The Court does not conduct an independent review and substitute its judgment for that of the SO.  <u>Murphy v. Commissioner</u>, 125 T.C. 301, 320 (2005), <u>aff'd</u>, 469 F.3d 27 (1st Cir. 2006); <u>Link v. Commissioner</u>, T.C. Memo. 2013-53.  If the SO follows all statutory and administrative guidelines and provides a reasoned, balanced decision, the Court will not reweigh the equities.  <u>Fifty Below Sales & Mktg., Inc. v. United States</u>, 497 F.3d 828, 830 (8th Cir. 2007); <u>Link v. Commissioner</u>, T.C. Memo. 2013-53.

In deciding whether the SO abused her discretion in sustaining the proposed collection actions, the Court considers whether she:  (1) properly verified that the

---

[25](...continued)
respect to the 2003 DAD transaction at the time they filed their 2003 Form 1040 was neither actually nor necessarily determined by the District Court.

**[\*41]** requirements of any applicable law or administrative procedure have been met; (2) considered any relevant issues petitioners raised; and (3) determined whether "any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the person that any collection action be no more intrusive than necessary." See secs. 6320(c), 6330(c)(3).

Petitioners in their motion for summary judgment set forth that the SO failed to verify that all the necessary legal and administrative procedural requirements have been met under section 6330(c)(1) because Form 4549-A was not part of the administrative record. Petitioners do not raise any arguments with respect to the second and third requirements of section 6330(c)(3).

Numerous cases, however, establish that no particular form of verification of an assessment is required, that no particular document needs to be provided to a taxpayer at an administrative hearing conducted under section 6330, and that a Form 4340, Certificate of Assessments, Payments, and Other Specified Matters, and other transcripts of account satisfy the verification requirements of section 6330(c)(1). See Burke v. Commissioner, 124 T.C. 189, 195 (2005); Roberts v. Commissioner, 118 T.C. 365, 371 n.10 (2002), aff'd, 329 F.3d 1224 (11th Cir. 2003); Nestor v. Commissioner, 118 T.C. 162, 166 (2002).

**[\*42]** The SO reviewed transcripts, which showed that the assessments were timely and that the levy notice and the NFTL filing were preceded by notice and demand for payment. The SO also obtained copies of the FPAA issued to the partners of LABAITE and filings from the U.S. District Court for the District of Connecticut suit with respect to LABAITE. Although the SO failed to notice an error in the calculations of petitioners' assessment,[26] the Court finds no abuse of discretion in the SO's review.

III.    Remand

The Court can remand a CDP case to the IRS Appeals Office when the Court determines that a further hearing would be "helpful", "necessary", or "productive". Kelby v. Commissioner, 130 T.C. 79, 86 n.4 (2008); Lunsford v. Commissioner, 117 T.C. 183, 189 (2001); see Martin v. Commissioner, T.C. Memo. 2003-288, slip op. at 17, aff'd, 436 F.3d 1216 (10th Cir. 2006). The parties conceded that remanding this case to the Appeals Office would not be necessary or productive. Because the Court could--and did--review petitioners'

---

[26]Respondent has conceded that in the SO's review she failed to notice an error on petitioners' Form 4549-A in the computation of assessed tax. The amount shown appears to be the sum of two numbers:  the correct adjustment of $10,317,644 that flowed through to petitioners from GUISAN and an erroneous disallowance of an additional $98,048. Respondent has conceded that this error resulted in overassessments of tax and penalty of $35,346 and $14,138, respectively.

**[*43]** underlying penalty liability, see McNeill I, 148 T.C. at __ (slip op. at 14), the Court agrees with the parties that a remand would not be appropriate and that this proceeding allowed petitioners the opportunity to challenge the amounts of the computational adjustments flowing from the FPAA. See McNeill v. United States, 836 F.3d 1282, 1285 (10th Cir. 2016) (noting that section 6230(c)(4) allows a partner to assert any partner-level defense that may apply or to challenge the amount of the computational adjustment).

IV.    Conclusion

Petitioners have failed to show under section 6664(c)(1) that they had reasonable cause for the underpayment resulting from the 2003 DAD transaction. Petitioners did not rely on EY and could not reasonably rely on De Castro or BDO for advice related to the DAD transaction. And the Court finds no abuse of discretion in the SO's determinations that have not been corrected during these proceedings. Accordingly, the Court will sustain respondent's lien and levy actions against petitioners.

**[*44]** The Court has considered all of the arguments made by the parties and, to the extent they are not addressed herein, they are considered unnecessary, moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.